1  Jeffrey N. Pomerantz (CA Bar No. 143717)
   Linda F. Cantor (CA Bar No. 153762)
2  Robert M. Saunders (CA Bar No. 226172)
   PACHULSKI STANG ZIEHL & JONES LLP
3  10100 Santa Monica Blvd., 11th Floor
   Los Angeles, California  90067-4100
4  Telephone: 310/277-6910
   Facsimile:  310/201-0760
5
   [Proposed} Attorneys for Debtor and Debtor in Possession
6

7

8                UNITED STATES BANKRUPTCY COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10                SAN FERNANDO VALLEY DIVISION

11

12  In re:                          Case No.: 1:10-bk-15358 GM

13  OCEAN PARK HOTELS-TOY, LLC,      Chapter 11
    a California limited liability company,
14
                   Debtor.
15

16                                   Case No. 1:10-bk-15359 GM
    In re:
17                                   Chapter 11
    OCEAN PARK HOTELS-TOP, LLC,
18  a California limited liability company,   **DECLARATION OF JAMES M.
                                              FLAGG IN SUPPORT OF
19                 Debtor.                     EMERGENCY MOTIONS**

20
                                     Date:   May 10, 2010
21                                   Time:   2:00 p.m.
                                     Place:  Courtroom 303
22                                           United States Bankruptcy Court
                                             21041 Burbank Boulevard
23                                           Woodland Hills, California 91367
                                     Judge: Honorable Geraldine Mund
24

25      I, James M. Flagg, declare as follows:

26      1.      I am the managing member of Ocean Park Hotels-TOY, LLC ("TOY") and Ocean

27  Park Hotels-TOP, LLC ("TOP"), the debtors and debtors in possession (the "Debtors") in the above-

28  captioned cases (the "Cases").  I am also the president of Ocean Park Hotels, Inc, the manager of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Debtors under certain management agreements ("Ocean Park" or "Hotel Manager"). I am generally

2  familiar with the day-to-day operations, business and financial affairs of the Debtors.

3          2.       Except as otherwise stated, all facts contained within this Declaration are based upon

4  personal knowledge (albeit my own or that gathered from others within the Debtors' organization),

5  my review of relevant documents, or my opinion based upon my experience concerning the

6  operations of the Debtors. If called upon to testify, I would testify to the facts set forth in this

7  Declaration.

8          3.       I submit this Declaration in support of the "first-day" relief that the Debtors have

9  requested in the emergency motions (the "Emergency Motions") listed and discussed below, and to

10  assist the Court and other interested parties to understand the circumstances that compelled the

11  commencement of these Cases. The relief sought in the Emergency Motions is intended to enable

12  the Debtors to continue to operate effectively, thereby avoiding or minimizing certain adverse

13  operational and financial consequences that might otherwise result from the commencement of these

14  Cases. I have reviewed the Emergency Motions and believe that the relief sought in them is

15  essential to ensuring the uninterrupted operation of the Debtors' business, and the success of the

16  Cases.

17          4.       After the filing of their Petition, the Debtors filed (concurrently with this

18  Declaration), the following Emergency Motions:

19          a.       *Motion for Order Pursuant to Fed. R. Bankr. P. 1015(b) Directing Joint*

20  *Administration*;

21          b.       *Emergency Motion of Debtors for Order Limiting Scope of Notice*;

22          c.       *Emergency Motion for Order Pursuant to 11 U.S.C. §§ 363, 1107 and 1108*

23  *(I) Authorizing Continued Use of Cash Management System with Respect to Certain Bank Accounts and*

24  *Continued Use of Business Forms (II) Waiving Section 345(B) Deposit Requirements;*

25          d.       *Emergency Motion for Order (I) Authorizing, but Not Requiring Debtor to (A)*

26  *Pay Prepetition Wages, Salaries, Benefits, Other Compensation and Reimbursable Expenses, (B)*

27  *Remit Withholding Obligations, and (C) Maintain Employee Compensation and Benefits Programs*

28  *and Pay Related Administrative Obligations and (II) Authorizing and Directing Applicable Banks*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

*and Other Financial Institutions to Receive, Process and Honor Transactions Relating to the Foregoing;*

e.    *Emergency Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection for Use of Prepetition Collateral, and (C) Granting Related Relief;*

f.    *Emergency Motion for an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers; and*

g.    *Emergency Motion of Debtors for an Order Extending Time to Complete Schedule of Assets and Liabilities and Statement of Financial Affairs.*

5.    In addition, the Debtors plan to file shortly thereafter applications to employ various professionals, including, but not limited to an application to employ Pachulski Stang Ziehl & Jones LLP as the Debtor's bankruptcy counsel *nunc pro tunc* as of the Petition Date.

6.    This Declaration is divided into three parts: Part I of this Declaration provides an overview of the Debtors' business, organizational and liability structure; Part II provides a discussion of the events that compelled the commencement of these Cases; Part II sets forth the relevant facts in support of the Emergency Motions.

## I.

## BACKGROUND

7.    On May 6, 2010 (the "Petition Date"), the Debtors commenced these cases (the "Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or official committee has been appointed in the Cases. On the Petition Date, the Debtors filed a motion for joint administration of the Cases under Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

8.    The Debtors are TOY and TOP. TOY owns the 120-room focused-service Courtyard by Marriott hotel located at 1710 Newbury Road, Thousand Oaks, California (the "Courtyard

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Hotel"). TOP owns the 93-room extended-stay Marriott TownePlace Suites hotel located at 1712 Newbury Road, Thousand Oaks, California (the "Suites Hotel," and, collectively, with the Courtyard Hotel, the "Hotels").

9.      The Courtyard Hotel opened in December 2006 and the Suites Hotel opened in April 2007. Since opening, the Hotels have been operated continuously and have received laudable ratings from Marriott International, Inc. ("Marriott"). In September, 2009, Marriott conducted a performance and operational review of the Courtyard Hotel; it received a total score of 98 out of a possible 100. The most recent performance and operational review of the Suites Hotel was conducted on February 4, 2010, resulting in a score of 97 out of 100 – the highest score of any Towne Suite Marriott facility in the United States.

10.      The Hotels have continued to maintain viable occupancy rates during the current economic climate. The Courtyard Hotel had an average occupancy rate of 73.84% for March 2010 and an average occupancy rate of 67.17% for the first quarter of 2010. The Suites Hotel had an average occupancy rate of 70.00% for March 2010 and an average occupancy rate of 72.86% for the first quarter of 2010. The Debtors project that the average annual revenues for years 2009 and 2010 will be approximately $4.2 million for the Courtyard Hotel and approximately $2.65 million for the Suites Hotel. The current and projected operating revenues are sufficient to allow the Debtors to pay on-going operational expenses.

11.      The Hotels are managed by Ocean Park, which is a developer, owner and operator of focused-service and extended-stay hotels with corporate office in San Luis Obispo, California. Ocean Park's managed hotel properties operate under the flags of Marriott, Hilton, Holiday Inn Express, and Best Western franchises, with hotels currently operating in California in Thousand Oaks, Camarillo, Valencia, San Luis Obispo, Goleta (Santa Barbara) and Poway (San Diego). I serve as the Ocean Park's president, and, during my twenty-year real estate career, I have been involved in over $1 billion of real estate transactions. TOY and TOP are each California limited liability companies. CEF Equities, LLC owns a 75% membership interest in each Debtor (CEF Equities, LLC is 100% owned by the Claire E. Flagg Trust). I own a 25% membership interest. I

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    am the Manager of each Debtor under their respective limited liability company operating

2    agreements.

3                                                  II.

4                                             **EVENTS**

5    **LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

6          12.    Construction of the Hotels began in or about November 2004 funded by a

7    construction loan (the "Loan") from Nationwide Life Insurance Company ("Nationwide" or

8    "Lender").  Under a construction loan agreement dated as of November 18, 2004 (as amended, the

9    "Loan Agreement"), Nationwide agreed to loan TOY and TOP initially $23,750,000 (increased to

10   $25,319,000 in 2006) for construction of the Hotels, to be secured by construction deeds of trust,

11   UCC filings and assignments of lease and rents.  The Loan is guaranteed by Ocean Park the Claire E.

12   Flagg Trust, and me.  The Loan is serviced for Nationwide by RBC Investment Services LLC

13   ("RBC"), whose sole member RockBridge Capital, LLC.

14          13.    The Loan matured by its terms on December 1, 2009 (the "Maturity Date").  On

15   December 2, 2009, RBC sent TOY and TOP a notice of default.  On March 1, 2010, and again on

16   March 9, 2010, Nationwide sent TOY and TOP demand letters for repayment of the Loan.

17          14.    On April 6, 2010, Nationwide filed its *Complaint for Foreclosure of Trust Deed and*

18   *Specific Performance* in the Superior Court of the State of California in Ventura County.  The

19   foreclosure action was assigned case number 56-2010-00370987-CU-OR-VTA (the "Foreclosure

20   Action").

21          15.    On April 8, 2010, Nationwide filed its *Ex Parte Application for Order Appointing*

22   *Receiver, Temporary Restraining Order and Order to Show Cause Re Appointment of Receiver and*

23   *Preliminary Injunction; and Points and Authorities in Support Thereof* (along with supporting

24   declarations) (the "*Ex Parte* Application").  On April 9, 2010, TOY and TOP filed their *Opposition*

25   to the *Ex Parte* Application on the grounds, *inter alia*, that the appointment of a Receiver (i) is

26   unnecessary and unwarranted under the circumstances, (ii) would impede the Hotels' operations and

27   hurt employee morale,and (iii) impair the value of the Hotels to the detriment of all parties in

28   interest.  The *Ex Parte* Application was heard and all relief sought (temporary restraining order,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    appointment of receiver and preliminary injunction) was denied by the superior court on an *ex parte*

2    basis on April 9, 2010.

3          16.    A hearing on whether the relief sought in the Application should be granted after

4    notice and full briefing is scheduled for May 6, 2010.  TOP and TOY filed their opposition to the *Ex*

5    *Parte* Application on April 23, 2010, and Nationwide filed a reply to the opposition on April 30,

6    2010.  No injunctive relief is currently in place.

7          17.    I believe that the value of the Hotels substantially exceeds the amount owed to

8    Nationwide on the Loan.  Specifically, I believe that the value of the Hotels is in excess of $30

9    million.  In order to maintain the value of the Hotels for the benefit of all constituents, the Debtors

10   filed their petitions for relief under the Bankruptcy Code.  The Debtors are exploring alternatives to

11   maximize the value of the estates, including possibly refinancing the Loan, a sale of one or both of

12   the Hotels or a restructuring of the Loan and their other obligations under a chapter 11 plan of

13   reorganization.

## III.

## EMERGENCY MOTIONS

14

15

16         18.    As I stated above, I believe that the Emergency Motions are essential to maintain

17   continuing, uninterrupted operations as the Debtors' transition into the Cases.   The Emergency

18   Motions are discussed below.

19   **A.    Emergency Motion for Order Directing Joint Administration of Related Cases
            Pursuant to Federal Rule of Bankruptcy Procedure 1015(b)**

20

21         19.    By their *Emergency Motion Directing Joint Administration of Related Cases*

22   *Pursuant to Federal Rule of Bankruptcy Procedures 1015(b)* (the "Joint Administration Motion"),

23   the Debtors request joint administration of these Cases only with respect to purely administrative

24   matters, including a joint pleadings docket (excluding, subject to further order of the Court, the

25   listing of filed claims), a joint pleadings caption, and combined notices to creditors.  The Debtors do

26   not request substantive consolidation of the Debtors' estates at this time, but reserve the right to do

27   so in the future.  Accordingly, the Debtors seek an order authorizing the joint administration of these

28   Cases, as set forth herein.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

20.    I believe without joint administration, the duplication of documents and effort would create unnecessary costs and tax the administrative facilities of the Debtors and their attorneys, diverting valuable resources away from addressing substantive issues, including the operations of the Debtors' businesses and the development of a restructuring plan.

21.    I believe that if the Joint Administration Motion is not granted, the Debtors' creditors will similarly feel the burden.  As with the Debtors, creditors will also be required to file duplicate copies of pleadings (with only the caption changed) in each of the Cases for no reason other than to maintain separate dockets and files.  Moreover, by maintaining separate Cases, some creditors may be confused as to when their rights are being affected, as they may be creditors of one estate or both. By jointly administering the Cases, creditors will receive notice of all matters involving both Debtors, thereby insuring that they are fully informed of all matters potentially affecting their claims.

22.    The facts supporting joint administration of the Cases are as follows: (a) the two Debtors are affiliated; (b) the Debtors operate as part of an integrated enterprise and (c) joint administration will ease the administrative burden on the Court, the Debtors and the parties and reduce the costs for all parties in administering these Cases.

23.    The Debtors propose that the joint administration of the Debtors be implemented as follows:

(a)    <u>Pleadings</u>.  The use of a single docket for both Cases and for filing, lodging and docketing the pleadings, orders and all other papers (including notices of hearing in any of the Cases) under the caption and case number of, and in the form attached to the Joint Administration Motion as Exhibit A.  Each pleading shall indicate which of the Debtors is party to or affected by the subject filing.

(b)    <u>Proofs of Claim</u>.  Because the Debtors are separate entities, and there has been no substantive consolidation of the estates, proofs of claim should be captioned for the particular estate against which the claim is asserted.  Further, the Clerk should maintain separate claims registers for each estate.

(c)    <u>United States Trustee's Reporting Requirements</u>.  All reports and statements filed with the Office of the United States Trustee shall be filed separately for each Debtor and maintained

1  for each Debtor.

2       (d)    <u>Schedules of Assets and Liabilities and Statement of Financial Affairs</u>.  Each Debtor

3  shall file separate Schedules of Assets and Liabilities and Statement of Financial Affairs.

4       (e)    <u>Notice to Creditors of Entry of Order</u>.  After entry of the Order approving the joint

5  administration, the Debtors shall transmit to all known creditors of each estate a notice setting forth

6  the pertinent information with respect to the joint administration (which notice may be combined

7  with other notices to creditors).

8       24.    I do not believe that there would be any material prejudice to creditors if the Debtors'

9  estates are jointly administered in that joint administration does not equate to substantive

10  consolidation.  I believe that joint administration would benefit all creditors by substantially

11  reducing costs and administrative burdens in general.

12  **B.**          **Emergency Motion of Debtors for an Order Limiting Scope of Notice**

13       25.    The Debtors' consolidated creditor matrix in these Cases contains approximately 500

14  parties and the Debtors anticipate that numerous creditors will assert claims against the estates.

15  Requiring notice to, and service upon, so many persons or entities would substantially augment the

16  cost and administrative burden to the Debtors and their estates and diminish the assets ultimately

17  available for reorganization without conferring any meaningful benefit on the Debtors' estates.  I

18  submit that the proposed limited scope of notice is necessary to avoid the administrative costs of

19  serving notice of all pleadings on hundreds of parties while simultaneously assuring that the

20  interested parties in these cases receive proper and sufficient notice of all matters.

21       26.    By their *Emergency Motion of Debtors for an Order Limiting Scope of Notice* (the

22  "Limited Notice Motion"), the Debtors seek an order authorizing the Debtors to limit notice of the

23  Limited Notice Matters (as defined below) in these Case to the following parties: (a) the Office of

24  the United States Trustee; (b) counsel for any official unsecured creditors committee appointed in

25  these cases, or until such time as counsel is named, the creditors appearing on the lists filed in

26  accordance with Bankruptcy Rule 1007(d)**;** (c) parties that file with the Court and serve upon the

27  Debtors a request for notice of all matters in accordance with Bankruptcy Rule 2002(i); and (d) any

28  party with a pecuniary interest in the subject matter of the particular Limited Notice Matter or its

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

counsel (hereinafter, the "Limited Service List").  I believe that if the relief requested in the Limited

Notice Motion is granted, the burden, complication, delay and cost to the Debtors' estates that is

associated with administering these case and providing notice of the proceedings in these case to

many thousands of parties would be dramatically reduced.

27.    The Debtors request that the Court limit the scope of service of all notices, motions,

or applications, including, but not limited to, the following:

- any proposed use, sale, or lease of property of the estate pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 4001(b), and 6004 (except a sale of substantially all assets of the any of the Debtors);

- any proposed debtor in possession financing or use of cash collateral;

- any proposed extension of the Debtors' exclusive time to file a plan of reorganization and solicit acceptance thereof (including, without limitation, the time to file a disclosure statement) pursuant to section 1121 of the Bankruptcy Code and Bankruptcy Rule 3016;

- any proposed approval of a compromise or settlement of a controversy pursuant to section Bankruptcy Rules 2002(a)(3) and 9019 and/or section 363 of the Bankruptcy Code;

- any proposed abandonment or disposition of property of the estate pursuant to section 554 of the Bankruptcy Code and Bankruptcy Rules 6007(a) or (c);

- any proposed assumption, assumption and assignment or rejection of contracts or leases under section 365 of the Bankruptcy Code and Bankruptcy Rule 6006(a) or (c);

- any proposal to prohibit or condition the use, sale or lease of property pursuant to § 363 of the Bankruptcy Code or Bankruptcy Rule 4001(a);

- any proposed objections to claims pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rules 3002, 3003 or 3007;

- any verified statement filed by any entity or committee (other than those appointed pursuant to section 1102 or 1104 of the Bankruptcy Code) representing more than one creditor pursuant to Bankruptcy Rule 2019(a) and any motion filed in respect thereof pursuant to Bankruptcy Rule 2019(b);

- any proposed application for employment of professionals pursuant to sections 327, 1103 or 1104 of the Bankruptcy Code or Bankruptcy Rule 2014;

- any proposed application for compensation or reimbursement of expenses of professionals, pursuant to sections 328, 329, 330, or 331 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(6), 2016, 2017, and 6005; except as provided by other orders of this Court;

- a hearing on any other contested matter in this case that requires notice to all creditors or equity holders pursuant to the Bankruptcy Code, Bankruptcy Rule 9014, or the Local Bankruptcy Rules; and

- all other pleadings, papers, and requests for relief or other order of the Court.

28.    Notwithstanding the foregoing, the relief requested in the Limited Notice Motion

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   does not affect the rights of all creditors and parties in interest in these cases to receive notice of the

2   following matters or proceedings:  (a) the meeting of creditors; (b) the deadline for filing proofs of

3   claim; (c) a hearing on any motion to dismiss or convert the Cases; (d) the time fixed for filing

4   objections to any disclosure statement and any hearing to consider approval of any disclosure

5   statement; (e) the time fixed for accepting, rejecting, or objecting to confirmation of a chapter 11

6   plan and the hearing thereon; (f) the time fixed to accept or reject a proposed modification of a

7   chapter 11 plan; (g) the entry of an order confirming a chapter 11 plan; and (h) any notice required

8   by order of this Court.

9          29.    I believe the above proposed limited notice procedures are necessary and appropriate

10  given that the creditor body is so large and many of the creditors would not be interested in receiving

11  copies of all the Limited Notice Matters.  Requiring notice to, and service upon, so many parties,

12  therefore, would substantially augment the cost and administrative burden on the Debtors, without

13  conferring any meaningful benefit to the Debtors' estates, and would thus diminish the assets

14  ultimately available for distribution to creditors.  Further, allowing service of an emergency or

15  expedited motion by overnight delivery in the instances outlined above provides the other parties

16  notice of the matter and preserves the Debtors' ability to bring such matters on a timely and efficient

17  basis.  I believe that such notice constitutes due and sufficient notice of the Limited Notice Matters.

**C.  Emergency Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 363, 1107 and 1108**
18  **(I) Authorizing Continued Use of Cash Management System with Respect to Certain**
    **Bank Accounts and Continued Use of Business Forms (II) Waiving Section 345(B)**
19  **Deposit Requirements; and (III) Granting Related Relief**

20         30.    By their *Emergency Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 363,*
21  *1107 and 1108 (I) Authorizing Continued Use of Cash Management System with Respect to Certain*

22  *Bank Accounts and Continued Use of Business Forms (II) Waiving Section 345(B) Deposit Requirements;*

23  *and (III) Granting Related Relief* (the "Cash Management Motion"), the Debtors are seeking entry of

24  an order of an order or orders (a) authorizing each of the Debtors to maintain and continue to use its

25  existing cash management system, as modified as described in the Cash Management Motion, with

26  respect to certain bank accounts and business forms, (b) waiving 11 U.S.C. § 345(b) deposit

27  requirements**,** (c) granting the Debtors' depository banks limited relief from the automatic stay to

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  continue to offset standard monthly or periodic bank fees against certain of the Debtors' accounts in

2  the same manner as such fees were offset prior to the Petition Date, and (d) granting such other and

3  further relief as is just and proper under the circumstances.  I believe the Debtors will experience

4  irreparable harm without the relief requested in the Cash Management Motion.

5       31.    Each Debtor maintains its own separate cash management system (the "Cash

6  Management System") using two separate accounts at Wells Fargo Bank, N.A. ("Wells Fargo").[1]

7  Each Debtor uses an operating account ("Operating Account") from which the Debtor pays its

8  operating expenses (including payroll) and a separate manager's account ("Manager's Account")

9  that typically contains a relatively small balance for use for day-to-day expenses (including some

10 termination payments to employees) by the General Manager for the Hotels.  The Cash Management

11 System has been in place since the opening of each Hotel.

12      32.    Under each Debtor's Cash Management System, incoming funds (consisting of cash

13 initially placed in the hotel safe, checks deposited into the Operating Account by scanning them on-

14 site, and credit card receipts) are transferred into each Debtor's Operating Account.  Bank and credit

15 card accounts are reconciled monthly.

16      33.    Each of the Debtors has a drop safe where cash is placed in a drop envelope by every

17 cashier for all shifts, verified, witnessed and dropped into the drop safe.  At the Courtyard Hotel, the

18 Front Office Manager that accesses the drop safe, verifies the cash drops then prepares the deposits

19 into TOY's Operating Account.  At the Suites Hotel, the Assistant General Manager that accesses

20 the drop safe, verifies the cash drops then prepares the deposits into TOP's Operating Account.

21      34.    Checks are electronically deposited into the respective Operating Accounts using a

22 desktop scanning machine known as a "Panini" and cash is taken to Wells Fargo within two business

23 days of receipt, depending on the amount of cash deposits.  Credit cards are automatically deposited

24 each night through a credit card processing company, into the respective Operating Accounts.  The

25 Debtors have obtained approval from each credit card company to utilize their Operating Accounts

26 at Wells Fargo as the depository institution into which the credit card funds are deposited.  The

27

28
---
[1] Prepetition, each Operating Account was swept nightly into an offshore investment account maintained at an affiliate of Wells Fargo.  Postpetition, the Operating Accounts will not be swept.

1   process of obtaining approval from the credit card companies to change the bank and the account

2   into which the funds are deposited is a lengthy and time consuming process.  Thus, I believe that any

3   variation from the procedure utilized at the present time would cause extreme disruption to the

4   Debtors' operations and would be counterproductive to the orderly administration and reorganization

5   of these cases.

6          35.    Transfers are made between each Debtor's Operating Account and Manager's

7   Accounts as the need arises.  A minimal balance is maintained in each Manager's Account and the

8   General Manager is the only property-level individual with signing authority on that account.

9          36.    Manager's Accounts checks are typically drawn by the General Manager for final

10  paycheck payments for terminations without sufficient notice and emergency purposes.  A Vice

11  President at Ocean Park transfers funds to the respective Manager's Accounts from the Operating

12  Accounts to cover any checks that are drawn and presented with full backup from the General

13  Manager.

14         37.    The checks are electronically generated by the Debtors for remittance to vendors and

15  third parties with check stock on which the Debtors banking information is reflected.

16         38.    In my capacity as president of Ocean Park and the managing member of each of TOY

17  and TOP, I am the only person who has check signing authority for each Debtor's Operating

18  Account from which the majority of all checks are written and invoices paid.

19         39.    I believe that the Debtors' Cash Management System is similar to those commonly

20  employed by many other hotels because of the numerous benefits provided, including the ability to

21  (a) quickly create status reports on the location and amount of funds, allowing management to track

22  and control corporate funds; (b) ensure cash availability; (c) guard against check and bank fraud by

23  reducing the number of accounts that require monitoring; and (d) reduce administrative expenses by

24  facilitating the movement of funds.

25         40.    I also believe that Cash Management System enables the Debtors to maintain control

26  over the administration of the respective Debtor's accounts, all of which facilitates effective

27  collection, disbursement, and movement of funds.  Both Debtors maintain their bank accounts with

28  Wells Fargo located at 50 Upper Ragsdale Road, Monterey, California 93940.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

41.     The Debtors have also arranged with Wells Fargo for the establishment of new bank accounts for each Debtor, to be used postpetition as described below; however, the Debtors request authority to maintain their existing Operating Accounts solely for the purposes of receiving deposits of credit card receipts (due to the attendant delay in obtaining credit card company approval for new accounts, as described above).  Upon approval by this Court, postpetition, each Debtor will maintain its existing Operating Account (on which no new checks will be drawn), a new Operating Account (on which postpetition checks will be drawn), a new Manager's Account (which will serve the same purposes as the existing Manager's Account), a new tax account and a new payroll account (to comply with the applicable guidelines of the Office of United States Trustee).[2]  Each Debtor also plans to open a savings or other FDIC-insured interest-earning account at Wells Fargo or one or more other approved financial institutions in order to earn interest on funds of the estate.[3]

42.     I am informed and believe that the United States Trustee's Operating Guidelines and Reporting Requirements ("U.S. Trustee Guidelines") require a chapter 11 debtor in possession to close all existing accounts and open new bank accounts in certain financial institutions designated as authorized depositories.  I am informed and believe that the U.S. Trustee Guidelines also require that a debtor have a minimum of three new debtor in possession accounts:  general, payroll and tax.

43.     I am informed and believe that Local Bankruptcy Rule 2015-2 requires that a debtor comply with the U. S. Trustee Guidelines.  The Debtors hereby seek a waiver of the U.S. Trustee's requirements that they close the Operating Accounts into which the credit card funds are deposited each night.  The Debtors request that these Operating Accounts remain open solely as a depository account for credit card receipts.  As noted above, the process of obtaining approval from credit card companies to change the bank and/or the account into which funds are deposited is a lengthy and time consuming process.  The Debtors require immediate access to credit card receipts, which make

[2] Each Debtor's payroll is typically disbursed to employees by the independent payroll service provider Automatic Data Processing, Inc. ("ADP").  Prepetition, TOY funded its payroll to ADP from its Operating Account in advance of each Payroll Date and ADP pays TOY's employees; TOY's Employees are paid by ADP using direct deposits or checks drawn directly from TOP's Operating Account.  ADP debits each Debtors accounts for its fees.

[3] To the extent that each Debtors' funds exceed the $250,000 FDIC insurance limit at Wells Fargo, the Debtor would open an account at another FDIC-insured approved financial institution.  For temporary periods, each Debtor's funds at Wells Fargo may exceed the $250,000 FDIC insurance limit, and therefore the Debtors request that this Court approve waiver of the investment requirements under 11 U.S.C. § 345(b) to permit the Debtors to temporarily hold funds at Wells Fargo in excess of the FDIC insurance limit.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

up the bulk of revenues collected from customers of the Hotels.  In order to allow the Debtors'

continued access to credit card funds and thereby avoid interruption of business operations, it is

imperative that the Debtors be authorized to maintain the use of their Operating Accounts solely for

purposes of credit card receipts.  Wells Fargo has been notified that, as of the Petition Date, no

checks from the existing Operating Accounts may be honored.

44.    As discussed above, the Debtors will open new postpetition Operating Accounts

("Postpetition Operating Accounts") and will sweep the funds from the Operating Accounts into the

Postpetition Operating Accounts on a daily basis.  Any and all checks written by the Debtors for

remittance to vendors and third parties will be drawn on the respective Debtor's Postpetition

Operating Accounts.  The Debtors shall also open new postpetition Manager's Accounts

("Postpetition Manager's Accounts"), postpetition tax accounts ("Postpetition Tax Accounts") and

postpetition payroll accounts ("Postpetition Payroll Accounts") for each Debtor at depositories

authorized by the U.S. Trustee.  As stated above, each Debtor also plans to open a savings or other

FDIC-insured interest-earning account at Wells Fargo or one or more other approved financial

institutions in order to earn interest on funds of the estate.

45.    I am informed and believe that section 345 of the Bankruptcy Code authorizes

deposits or investments of money of the estates, such as Debtors' cash, only in a manner that will

yield the maximum reasonable net return on such funds, taking into account the safety of each

deposit or investment.  If deposits or investments are not insured or guaranteed by the United States

or backed by the full faith and credit of the United States, section 345(b) of the Bankruptcy Code

provides that, unless the court for cause orders otherwise, the estate must require the entity with

which the money is deposited or invested to obtain a bond in favor of the United States that is

secured by the undertaking of an adequate corporate surety.  As discussed above, the Debtors seek a

limited waiver to permit each of them to hold temporarily hold funds at Wells Fargo in excess of the

FDIC insurance limit pending transfer of the funds to a FDIC-insured account at one or more

approved financial institutions (other than Wells Fargo).

46.    The depository banks where the Debtors will maintain their accounts will be federally

insured institutions that has been approved as a depository by the Office of the U. S. Trustee for

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Region 16.  The Debtors' Postpetition Operating Accounts will rarely, and in the past have typically

2  only temporarily, exceeded the $250,000 FDIC insurance limit.  The Debtors' accounts are,

3  therefore, generally in compliance with section 345 of the Bankruptcy Code.  Accordingly, the

4  Debtors submit that cause exists to waive the requirements of section 345 of the Bankruptcy Code

5  and not require bonding or other measures if the balance in a Debtor's Operating Account were to

6  exceed $250,000 temporarily.

7      47.    The Debtors are requesting that this Court enter an order: (a) authorizing the

8  maintenance and continued use of each Debtor's existing Operating Account solely as a depository

9  account as described herein and the continued use of the Debtors' Cash Management System, as

10  modified (as described in this Declaration and the Cash Management Motion); (b) waiving 11

11  U.S.C. § 345(b) deposit requirements to the extent funds on deposit exceed $250,000; (c) granting

12  the Debtors' depository banks limited relief from the automatic stay to continue to offset standard

13  monthly or periodic bank fees against the Debtors' accounts in the same manner as such fees were

14  offset prior to the Petition Date with respect to the Operating Accounts; and (d) granting such other

15  and further relief as is just and proper under the circumstances.

16      48.    The Debtors also request authority to continue using all existing correspondence and

17  business forms (including, but not limited to letterhead, purchase orders, invoices, etc.) without

18  reference to their "debtor in possession" status.  In the ordinary course of business, the Debtors use

19  pre-printed correspondence and business forms with Marriott-mandated formats.  The nature and

20  scope of the Debtors' business require that the Debtors be permitted to continue using their pre-

21  printed correspondence and business forms without alteration or modification.  Changing

22  correspondence and business forms would be unnecessary and burdensome to the estates, as well as

23  expensive and disruptive to the Debtors and the orderly administration of these Cases.  Also, under

24  its contracts with Marriott, each Hotel is required to used Marriott's designated forms.  Parties doing

25  business with the Debtors undoubtedly will be aware of these cases and the Debtors' status as

26  debtors in possession, given the integrated nature of the Debtors' industry, and the publicity

27  surrounding the Hotels.

28

**D.    Emergency Motion of Debtors for Order (I) Authorizing, but not Requiring, Debtors to Pay Prepetition (A) Wages, Salaries, and Other Compensation, (B) Employee Medical, Workers' Compensation and Similar Benefits, and (C) Reimbursable Employee Expenses; and (II) Authorizing Debtors To Reissue Checks Or Electronic Transfer Requests Relating To The Foregoing**

49.    By their *Emergency Motion of Debtors for Order (I) Authorizing, but not Requiring, Debtors to Pay Prepetition (A) Wages, Salaries, and Other Compensation, (B) Employee Medical, Workers' Compensation and Similar Benefits, and (C) Reimbursable Employee Expenses; and (II) Authorizing Debtors To Reissue Checks Or Electronic Transfer Requests Relating To The Foregoing* (the "Wage Motion"), the Debtors seek an order (i) authorizing, but not directing, the Debtors to pay or honor in their discretion certain Employee Obligations and Webster Obligations (defined below) and (ii) authorizing Debtors to reissue checks or electronic transfer requests relating to the foregoing.

50.    Due to the timing of the commencement of these Cases, certain employees of the Debtors (the "Employees") accrued prepetition Wages (defined below) for which payment would otherwise be made postpetition.  I believe that a blow to employee morale could clearly lead to disruptions to the Debtors' operations to the detriment of the Debtors' going concern value.  In particular, due to unavoidable timing issues associated with the commencement of these Cases, certain payroll obligations may have accrued, but gone unpaid, prior to the filing of the Cases.  I believe that if the Debtors are not permitted to meet all payroll-related obligations in the ordinary course of business, the Debtors could suffer unmanageable Employee outrage or turnover to the detriment of all parties to the Debtors' bankruptcy estates.  I further believe that any significant number of Employee departures or deterioration in morale at this time will substantially and adversely impact the Debtors' businesses and result in immediate and irreparable harm to the Debtors' estates.  Also, I believe it is important for TOY to continue to pay the Webster Obligations, which reimburse Ocean Park for the services of the Debtors' General Manager and to reimburse Ocean Park for insurance policy premiums paid by Ocean Park that benefit the Debtors' Employees.

51.    As of the Petition Date, the Debtors collectively employed approximately 51 full-time and seven part-time Employees.  TOY employs approximately 34 full-time Employees and two part-time Employees, of which four full-time Employees are salaried and 30 full-time (and both part-time) Employees are hourly.  TOP employs approximately 17 full-time Employees and five part-

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

time Employees, of which three full-time Employees are salaried and 19 full-time (and all part-time) Employees are hourly.  All of the Debtor's Employees work at their respective Hotels.  None of the Employees are insiders as I have been informed such term is defined in section 101(31) of the Bankruptcy Code ("Insiders").[4]

52.    The Debtors provide a benefits package that demonstrates its full level of commitment to its Employees.  The Debtors offer competitive salaries and wages, paid vacations and holidays, paid sick and other leave and medical and life insurance benefits for all Employees (and provides Employees with access to dental and vision insurance).  The Debtors also provide the statutory workers compensation benefits to all Employees.

53.    The Employees perform a variety of critical functions, including customer service, management, marketing, sales, technical services, housekeeping, food and beverage service and other tasks.  I believe that the Employees' skills and their knowledge and understanding of the Debtors' operations, customer relations and infrastructure are essential to the effective reorganization of the Debtors' business.

54.    As discussed further below, to minimize the hardship that the Debtors' workforce will suffer if prepetition obligations are not paid when due, and to avoid disruption of the Debtors' workforce as the Debtors pursue an orderly reorganization, the Debtors seek authority to pay certain prepetition claims for, among other items, wages, salaries, and other compensation including federal and state withholding taxes, payroll taxes, contributions to employee benefit plans, and all other employment related benefits, which the Debtors pay or provide in the ordinary course (collectively, the "Employee Obligations").  In addition, the Debtors request authority to pay to the appropriate third parties the amounts that are deducted and withheld from Employees' paychecks (the "Employee Deductions"), which are in most instances not property of the Debtors' estates, and to reimburse Employees for expenses incurred by such employees prepetition in the ordinary course of business (the "Employee Expenses").  Lastly, the Debtors seek to withhold and remit the appropriate Payroll Taxes (as defined below).  By the Wage Motion, the Debtors seek authority to pay, honor, or

[4] I am each Debtors' Manager and a member under its limited liability company operating agreement.  I am not an Employee of either Debtor.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

remit, in their sole discretion, Employee Obligations, Employee Deductions, Payroll Taxes, and Employee Expenses with respect to the Debtors' Employees (as of the Petition Date and postpetition). The Debtors also seek this Court's authorization to pay or reimburse Ocean Park for the Webster Obligations. The Debtors additionally seek authority to reissue checks or electronic transfer requests relating to the Employee Obligations.

55.    TOY and TOP each respectively employ all of their Employees. Other than as stated below, each Employee performs services only for his or hers employer's Hotel and is paid only by TOY or TOP and not both. The Debtors' Director of Sales and a Sales Manager perform services for both TOY and TOP. The Director of Sales is paid by TOP and the Sales Manager is paid by TOY.

56.    TOY and TOP, respectively, also employ the services of Mike Webster ("Webster") as General Manager, who is an employee of Ocean Park. Webster is not an Insider. He is a Marriott-trained manager. As such, he has the primary responsibility for the successful operation of both the Suites Hotel and the Courtyard Hotel. He oversees guest relations, revenue management, sales and marketing, housekeeping and maintenance, food and beverage operations, property-level human resources and risk management. An Assistant General Manager at each hotel (Suites Hotel and Courtyard Hotel) that is in Employee of TOY and TOP respectively assists him. He spends the vast majority of his time at the Courtyard Hotel as it is the larger of the two hotels (it has meeting space and a food and beverage operation; the Suites Hotel is an extended stay hotel with very limited service and guests there are more independent and its suites are akin to short-term apartments). In addition, Webster serves as a Regional General Manager for the Camarillo and San Luis Obispo, California hotels managed by Ocean Park (in an oversight capacity, he is available to consult with the General Managers of those hotels, and his time spent on this activity is *de minimis*).

57.    Ocean Park pays Webster his salary and provides him with benefits (I believe that Webster's compensation is consistent with industry norms).[5] Ocean Park is reimbursed by TOY for his salary, bonus, health, dental, vision and life insurance benefits, as well as for workers

---

[5] The benefits provided by Ocean Park differ from the benefits provided by TOY and TOP to its employees. He is on the Blue Shield PPO plan, Wells Fargo/MES vision insurance plan and Principal dental and life insurance plan of Ocean Park, for instance.

compensation insurance (the "Webster Obligations"). Ocean Park and TOY reconcile the amounts due to Ocean Park for the Webster Obligations monthly and Ocean Park bills them monthly to TOY.

58.    The average semi-monthly gross payroll for Employees is approximately $30,440.00 for TOY and $18,573.00 for TOP, which figure includes Wages, Employee Deductions and Employer Payroll Taxes. The Employees are paid their wages and salaries (the "Wages") semi-monthly, in arrears, on the fifth day after end of each pay period (or the weekday before if the pay day falls on a holiday or weekend) (each, a "Payroll Date"). The first payroll period in each month runs from the first to the 15th day of the month and the second payroll period of each month runs from the 16th day to the end of the month (each, a "Payroll Period"). All payments are made to Employees through direct deposit or check. The date on which the Employees were last paid was May 4, 2010, which Payroll Date was for the Payroll Period ending April 30, 2010. Each Employee that was not paid by direct deposit was issued a bank draft or cashier's check.

59.    Each Debtor's next Payroll Date subsequent to the Petition Date is scheduled for May 20, 2010 for the Payroll Period beginning prepetition on May 1, 2010 and ending postpetition on May 15, 2010, and will therefore include approximately $13,337.00 for TOY (including Webster Obligations) and $7,118.00 for TOP for the prepetition period of May 1, 2010 to and including May 6, 2010 (the "Prepetition Wages").

60.    Each Debtor's payroll is typically disbursed to Employees by the independent payroll service provider Automatic Data Processing, Inc. ("ADP"). TOY funds its payroll to ADP from its Operating Account at Wells Fargo typically one day in advance of each Payroll Date and ADP pays TOY's Employees; TOY's Employees are paid by ADP using direct deposits or checks drawn directly from TOP's Operating Account. ADP debits each Debtors accounts for its fees. As of the Petition Date, the Debtor did not owe ADP any unpaid fees with respect to ADP's processing of the Debtors' payroll and related administration (the "ADP Administration Fees"). The Debtor requests authority to pay ADP any ADP Administration Fees that ADP may be owed in connection with the foregoing services and to continue to pay ADP postpetition in the ordinary course of the Debtors' business with respect to the same.

61.    In sum, the Debtors seek authority to continue with their payroll schedule in the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

ordinary course of their business and consequently to pay all Prepetition Wages as planned on the

May 20, 2010 Payroll Date, as indicated above.  TOY also plans to pay its Webster Obligations and

each of the Debtors plan to make payments from time to time to Employees for prepetition amounts

owed that are not Prepetition Wages.[6]  In all instances, due to the fact that no Employee will be paid

more than $10,950 in Prepetition Wages (and contributions to employee benefit plans or ordinary

course performance bonuses, as discussed below), the Debtors will not make payroll distributions to

any particular Employee (or pay Webster Obligations) in an amount that would exceed the allowable

priority portion of such Employee's Prepetition Wages (and contributions to employee benefit plans)

under section 507(a)(4) or 507(a)(5) of the Bankruptcy Code, as I understand such sections of the

Bankruptcy Code based on information and belief.  I believe that the costs associated with paying

priority employee wage claims on the next routine Payroll Date are relatively minimal compared

with the damage to the Debtors' estates that would ensue if Employee morale were disrupted by the

Debtors' failure to meet their payroll obligations.

62.    In the ordinary course of their business, the Debtors pay Employees periodic bonuses

based on performance metrics (the "Ordinary Course Performance Bonuses"), which may be up to

15% of salary.[7]  Performance metrics for most Employees of the Hotels who receive performance

bonuses (mainly department heads, but not Webster, the Debtors' Director of Sales and sales

managers) are set by Webster as General Manager quarterly to incentivize such Employees to

remedy any perceived operational deficiencies in their area of operations.  Metrics for General

Manager are determined on a company-wide basis for all Ocean Park operated hotels; however,

performance is measured by the hotels that the General Manager manages (for Webster, TOY and

TOP).  Metrics for the Director of Sales and Sales Managers include sales-related activities (such as

sales calls) and sales revenue generated for TOY and TOP.  Typically, any Ordinary Course

Performance Bonuses accrue to the end of each calendar quarter and are paid within 45 days of the

---

[6] In addition to Prepetition Wages, some Employees may be owed prepetition amounts because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid and (b) some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

[7] Webster's bonus, which is paid by Ocean Park, is up to 20% of his salary.  An amount for Webster's bonuses are part of the Webster Obligations that TOY pays to Ocean Park.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   end of the quarter. The Debtors' first payroll after the Petition Date, to be paid on May 20, 2010,

2   will not include any Ordinary Course Performance Bonuses.

3          63.    In the ordinary course of their business, the Debtors also deduct from their

4   Employees' paychecks the following Employee Deductions (as applicable): (a) payroll taxes and the

5   Employees' portion of FICA, state disability and unemployment taxes; (b) Employee contributions

6   for health benefits, (c) legally ordered deductions such as wage garnishments, child support and tax

7   levies; and (d) miscellaneous other items. ADP remits amounts equal to the Employee Deductions

8   to appropriate third-party recipients. On average, TOY and TOP have deducted approximately

9   $4,379.79 and $2,622.98 from the Employees' paychecks every payroll, respectively.

10         64.    The Debtors are required by law to withhold from an Employee's wages amounts

11  related to federal, state and local income taxes, social security and Medicare taxes for remittance to

12  the appropriate federal, state or local taxing authority (collectively, the "Withheld Amounts"). On a

13  semi-monthly basis, the Withheld Amounts for TOY and TOP are approximately $4,379.79 and

14  $2,622.98, respectively. The Debtors must then match from their own funds for social security and

15  Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and

16  state unemployment insurance (the "Employer Payroll Taxes," and together with the Withheld

17  Amounts, the "Payroll Taxes"). On a semi-monthly basis, the Payroll Taxes, including both the

18  employee and employer portions for TOY and TOP are approximately $7,524.58 and $4,396.95,

19  respectively. The Debtors seek authority to continue to honor and process the Payroll Taxes

20  incurred prepetition on a postpetition basis, in the ordinary course of business.

21         65.    All full-time Employees are eligible to accrue vacation leave (the "Vacation Leave")

22  and sick leave (the "Sick Leave"). In the ordinary course of business, the Debtors generally do not

23  allow Employees to "cash out" any accrued Vacation Leave and Sick Leave, except in the case of

24  termination (the Debtors written vacation policies, however, permit each relevant Debtor to cash out

25  Employees who accrue more vacation time than permitted). Employees are also eligible for

26  bereavement leave and time off for voting and jury duty and other leave per the Debtors' written

27  policies ("Other Leave" ). The Debtors seek authority to continue to honor their Vacation Leave and

28  Sick Leave and Other Leave (collectively, "Leave") policies in the ordinary course of business.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

66.    The Debtors have established a variety of benefit plans and programs (the "Employee Benefits") designed to assist their Employees and their eligible dependents in meeting certain financial burdens, including those that can arise from illness, disability and death.  All full-time Employees may participate in certain of the Employee Benefits programs.

67.    The Debtors offer all full-time Employees basic medical insurance (the "Medical Plan") under a policy provided and operated by Kaiser Permanente.  Approximately eight TOY and five TOP full-time Employees are covered.  All premiums are paid on a cost-sharing basis between the Debtors and the Employees.  Under the Medical Plan, the Debtors pay 75% of the premiums per month and the Employees pay 25% of the monthly premiums.  Contributions for dependents' health insurance are made 100% by the Employee for the first three years of service and at the 75%-25% ratio for Employees with more than three years of service.  Ocean Park advances a monthly premium payment to Kaiser Permanente for the Medical Plan and, thereafter, the Debtors reimburse Ocean Park for their proportionate share of the premium each month (the policy also covers employees of Ocean Park-managed hotels that are owned by nondebtors, which reimburse Ocean Park for their shares of the premium).  The Debtors seek authorization to continue to reimburse Ocean Park for their respective shares of the premium payments advanced by Ocean Park.

68.    The Debtors also follow all federal COBRA laws and applicable state laws regarding health insurance, including continuation of coverage upon termination of employment if the Employee requests it.  The terminated Employee is responsible for payment of the premium with no cost to the Debtors.

69.    Those Employees who avail themselves of the dental and vision insurance provided by the Debtors (the "Dental/Vision Plan") bear 100% of the responsibility to pay the premiums for both Employee and dependent coverage.

70.    I believe that the Debtors continued provision of coverage under the Medical Plan and the opportunity to purchase Dental/Vision Plan are vital components of their Employee Benefits. Accordingly, the Debtors seek authority to continue providing coverage under such plans in the ordinary course of business.

71.    The Debtors also offer a life insurance benefit (the "Life Insurance Benefit") to their

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Employees through Mutual of Omaha.  This Life Insurance Benefit is afforded to the Employees as an accommodation as the cost of the policy is fully funded by the Employees with no cost to the Debtors.  Accordingly, the Debtors seek authority to continue providing their Employees with the ability to obtain the Life Insurance Benefit.

72.     The Debtors provide workers' compensation insurance for their Employees at the statutory-required level through CompWest Insurance Company (the "Workers' Compensation Insurance").  The Debtors pay monthly premiums for coverage under the Workers' Compensation Insurance.  The next monthly premium in the amount of $1,585.00 for TOY and $2,540.00 for TOP was due on May 1, 2010.  The estimated annual cost to the Debtors for the Workers' Compensation Insurance is $28,143.00 for TOY and $17,565.00 for TOP.  TOY and TOP each have their own Workers Compensation Insurance policy.

73.     By the Wage Motion, each Debtor requests authority to continue to maintain, to be exercised in their sole discretion, its Workers' Compensation Insurance in the ordinary course of business and to pay any and all prepetition amounts related thereto including, without limitation, any payments for workers' compensation claims, deductibles, premiums and fees owed for administrative costs and other amounts required in connection with the Workers' Compensation Insurance, as such amounts become due in the ordinary course of business.

74.     The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors.  Such expenses typically include, but are not limited to, parking and business-related travel expenses, including transportation, auto travel and car rental, lodging, meal charges, business lunches and entertainment expenses, telephone charges, and miscellaneous other allowed travel expenses (the "Reimbursement Obligations").  Expense reports detailing the expenses are submitted for reimbursement by the Employees to the General Manager and must be supported a reimbursement request with copies of receipts attached.  The Debtors seek authority, but not direction, to pay all Employee Expenses incurred prior to the Petition Date and to continue to pay the Employee Expenses postpetition in the ordinary course of business.

75.     In summary, the Debtors seek authority, in their sole discretion:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1.  To honor and pay, when due, all unpaid Prepetition Wages, prepetition Ordinary Course Performance Bonuses and Webster Obligations.

2.  To pay the applicable Payroll Taxes in connection with the Prepetition Wages and prepetition Ordinary Course Performance Bonuses;

3.  To permit the Debtors and their Employees to utilize Leave (whether accrued prepetition or postpetition) in the ordinary course of business;

4.  To make all appropriate Deductions and to forward the Deductions to the appropriate agency or plan administrator;

5.  To honor and pay, when due, all Employee Expenses; and

6.  To continue providing active Employees with the Employee Benefits and to pay, or otherwise honor, earned prepetition Employee Benefits.

**E.    Emergency Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral Pursuant to Stipulation, (B) Granting Adequate Protection for Use of Prepetition Collateral, and (C) Granting Related Relief  (Need exact name)**

76.    By their *Emergency Motion of Debtor for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection for Use of Prepetition Collateral* (the "Cash Collateral Motion")*,* the Debtors are seeking an order (1) approving the use of cash collateral on an emergency interim basis, subject to a budget and pending a final hearing, in such amounts necessary to enable the Debtors to operate their businesses and avoid immediate and irreparable harm, (2) granting adequate protection to Nationwide Life Insurance Company on an interim basis, and (3) scheduling and establishing deadlines regarding a final hearing on the Debtors' use of cash collateral

77.    The Loan is alleged to be secured by valid, enforceable, and properly perfected liens on and security interests in the Hotels and in the Debtors' personal property and other assets (the "Existing Collateral") including cash on hand of the Debtors and cash and receipts generated by the operation of the Debtors' businesses, which funds (if properly perfected) would constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"), as I have been informed and believe.  I also believe that an ongoing need exists for the Debtors' estates to use cash to allow the Debtors to continue the operation of the Debtors' businesses under chapter

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

11 of the Bankruptcy Code, to minimize any disruption of the Debtors' operations as "going concerns," and to reassure their vendors, customers, employees, and other constituents of the Debtors' continued viability. I further believe that without the immediate use of Cash Collateral, the Debtors' reorganization efforts will be stymied to the detriment of all stakeholders.

78.     Prior to and in anticipation of the Petition Date, the Debtors advised Nationwide that they would seek relief under chapter 11 of the Bankruptcy Code to protect and maximize the value of the Hotels. In this regard, the Debtors presented a proposed form of cash collateral stipulation ("Cash Collateral Stipulation") for Nationwide's review and consideration. As of the Petition Date, the Debtors had received no substantive response to the proposed Cash Collateral Stipulation from Nationwide.

79.     The Debtors hope to enter into discussions to reach a stipulation for the use of Cash Collateral with Nationwide in the near future. Nevertheless, a stipulation has not yet been reached. Therefore, the Debtors make their Cash Collateral Motion for an order authorizing them to use Cash Collateral without Nationwide's consent. If an agreement with Nationwide cannot be reached, the Debtors will request permanent use of Cash Collateral at the Final Hearing on this Motion.

80.     In order to address their working capital needs and fund their reorganization efforts, the Debtors require the use of what may be the Cash Collateral of the Lender in accordance with the Budget (defined below). I believe that the use of Cash Collateral will provide the Debtors with the necessary capital with which to operate their businesses; pay their employees; maximize value, including the value of the Existing Collateral; and pursue reorganization under chapter 11.

81.     The Debtors seek to use Cash Collateral and to grant to the Lender, as adequate protection of its interests in the Cash Collateral, solely to the extent of any diminution in value of the Cash Collateral, a replacement security interest in and lien upon the Existing Collateral and any proceeds thereof, as set forth below.

82.     In anticipation of these cases, the Debtors have developed cashflow projections reflecting anticipated revenue and expenditures through the week ending August 3, 2010, contained in the proposed Operations Budget (the "Budget") attached to the Motion as Exhibit "A," provided that Debtors seek authority to exceed 115% of the aggregate of the weekly expenditures reflected on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    the Budget (the "Allowed Variance"), measured on a four-week rolling basis.[8]  The Budget, which I

2    reviewed and approved sets forth the amount of cash necessary for the Debtors to operate their

3    businesses postpetition.  The Budget takes into account the effect this bankruptcy filing may have on

4    the Debtors' businesses and the expenses of the administration of these Cases.

5        83.    As set forth in the Budget, the Debtors seek authority to use cash on hand

6    (approximately $95,919 for TOY as of the Petition Date and approximately $163,118 for TOP as of

7    the Petition Date) and funds generated from operation of their businesses.  As I have been informed

8    and believe, such cash and receipts allegedly constitute Nationwide's "cash collateral" within the

9    meaning of section 363(a) of the Bankruptcy Code.

10        84.    I believe that the Debtors have an immediate need for the use of Cash Collateral in

11    order to maintain their business operations, which for TOY includes the 120-room focused-service

12    Courtyard by Marriott and for TOP the 93-room extended-stay Marriott TownePlace Suites, which

13    offer lodging, food and beverage service and a myriad of other customer services and supplies for

14    the guests of the Hotels. The Debtors' expected use of Cash Collateral during the interim and final

15    periods is reflected in the Budget.  I believe that all payments described in the Budget are necessary

16    to maintain and continue the Debtors' operations and preserve their going-concern value for the

17    benefit of the Debtors' creditors.  Specifically, the Debtors must have access to Cash Collateral to

18    make payments to vendors for postpetition goods, employees, sales taxes, utilities, management fees,

19    franchise fees, and other pertinent, ordinary expenses of their business.  Failure to make payments in

20    accordance with the Budget would result in the cessation of the Debtors' businesses, causing

21    immediate and irreparable harm to the Debtors' estates.  Because I believe that the liquidation value

22    of the Debtors' assets is substantially less than the going concern value, creditors and stakeholders

23    would likely receive substantially less in liquidation than they would receive if the Debtors are

24    allowed to operate and propose a plan of reorganization.  Put simply, the Debtors cannot continue

25    operations without the use of Cash Collateral, and if the Debtors are unable to operate, all parties

26    will be harmed.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[8]  Specifically, the first measure of compliance with the Budget and the Allowed Variance would cover weeks 1 through 4 of the Budget, the second Budget compliance period to cover weeks 2 through 5 of the Budget, and subsequent compliance periods to cover every successive four-week periods thereafter.

85.    In these Cases, I believe the Debtors will continue their operations and explore alternatives to maximize the estates' value including possibly refinancing the Loan, a sale of one or more of the Hotels or restructuring the Loan and their other obligations under a plan of reorganization.  I believe that the value of the Hotels are in excess of $30 million, providing Nationwide an equity cushion of at least 20% and potentially more.  I have been informed and believe that the equity in the Hotels provides the Lender with far more than the requisite adequate protection.

86.    As adequate protection for the use of Cash Collateral, the Debtors propose to grant Nationwide, without the necessity of the execution of any documentation, a valid, perfected, enforceable and non-avoidable replacement lien on the Existing Collateral and the proceeds thereof, including cash flow generated from operations but excluding Bankruptcy avoidance actions.  The adequate protection liens are granted only if and to the extent that Nationwide is properly secured in the Existing Collateral and use of that collateral diminishes its value.  While the Debtors' use of Cash Collateral will reduce the prepetition Cash Collateral, the operation of the businesses will continue to generate cash to replenish the consumed Cash Collateral.  I have been informed and believe that granting Nationwide a replacement lien in the Postpetition Collateral adequately protects Nationwide's position by giving it an ongoing interest in postpetition cash generated from its Existing Collateral

87.    I believe that allowing the Debtors to use Cash Collateral to finance their ongoing operations will preserve and enhance Nationwide's Existing Collateral.  I believe the value of the Debtors' assets is enhanced by the value of the revenue generated by operation of the Hotels as well as the goodwill associated with the Debtors' businesses. I believe the Debtors' ability to maximize the value of these assets is inextricably tied to maintaining the going concern value of the businesses, which in turn is dependent on having cash available to pay for operating expenses.  The Debtors are in the hospitality business and without the continuity of operations and an uninterrupted ability to conduct business, the Debtors could face significant customer defection, which would have an immediate and devastating effect upon the Debtors' future revenues and opportunity for reorganization.  If the Debtors do not have access to cash to pay their operating expenses, even for a

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

short amount of time, they would in all likelihood be forced to shut down and would be liquidated for far less than fair value.  As such, the use of Cash Collateral (including all cash existing on the Petition Date plus all post-petition revenue generated) to conduct the Debtors' businesses will not only preserve and protect the value of Nationwide's collateral generally – thus providing Nationwide with adequate protection of its interests – it will enhance and maximize the potential recovery for all creditors of the estates.  I believe that coupled with the equity cushion and the proposed replacement liens, there is no question that Nationwide is adequately protected.

88.    In the present case, I believe that emergency use of Cash Collateral by the Debtors, pending a final hearing, is necessary to prevent irreparable harm to the Debtors.  I also believe that if there is any interruption in the Debtors' hotel operations, the value of the businesses will be significantly impaired to the serious detriment of the Debtors, their creditors, employees, and customers.

89.    On the other hand, I believe that Nationwide will suffer little, if any, harm if interim relief is granted.  To the extent that Nationwide has an interest in property of these estates that is worthy of adequate protection, I have been informed and believe that interest is adequately protected by an equity cushion, the preservation of the value of its collateral through the Debtors continued business operations, and through the proposed replacement liens.

**F.    Emergency Motion for an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers**

90.    In the Debtors' businesses operations, guests who reserve a room at one of the Hotels guarantees the reservation with a deposit by way of a credit card or a cash deposit.   The Debtors are holding approximately 36 customer deposits totaling approximately $4,384.09 ("Deposit Obligations").

91.    The Debtors seek authority, in their discretion, to continue to honor the Deposit Obligations in the ordinary course of their businesses.  Such Deposit Obligations have been honored by the Debtors' in the ordinary course of business and are essential for the Debtors to stay competitive in their industry.  The Debtors also seek authority to return customer deposits in the ordinary course of business, such as when a guest timely cancels a reservation.

92.    The Debtors are seeking the relief requested in order to maintain customer confidence during the pendency of the Cases.  I believe that absent such relief, the Debtors' customer relations will be severely and irreparably harmed at a time when customer loyalty and patronage is extremely critical to the Debtors and the Debtors' ability to reorganize for the benefit of all of the parties in interest will be put in jeopardy.

93.    Further, I am informed and believe that section 507(a)(7) of the Bankruptcy Code provides that a claim of any customer, not to exceed $2,425, that arises from a deposit with the Debtors in connection with the purchase, lease or rental of property for the personal, family or household use of the individual is to be accorded priority.  All of the 36 customer deposits being held by the Debtors as guarantees for the guest rooms in the Hotel are in amounts less than $2,425.  Therefore, I am informed and believe that all of Deposit Obligations would be priority claims entitled to be paid in full under any plan of reorganization.

94.    I believe that the Debtors' business operations and their ability to retain customer loyalty and repeat business depends on their ability to honor the Deposit Obligations including, where appropriate, to return sums on deposit.  I also believe that the Court's authorization for the Debtors to continue honoring their Deposit Obligations in the ordinary course of business serves as a viable and equitable means for ensuring that the Debtors can continue their operations in the ordinary course, maximize the value of their estates for their creditors and reorganize their businesses for the benefit of all parties in interest.

95.    The Debtors' ongoing operations depend on the continued loyalty and patronage of their guests and I believe that the relief requested herein is essential to business operations and customer confidence.  I also believe that the Debtors' ability to honor Deposit Obligations will avoid claims, which are all priority claims against the estates, while preserving the profits from the revenues of the Hotels.

**G.    Emergency Motion of Debtors for an Order Extending Time to Complete Schedules of Assets and Liabilities and Statements Of Financial Affairs**

96.    By their *Emergency Motion of Debtors for an Order Extending Time to Complete Schedules of Assets and Liabilities and Statements Of Financial Affairs*, the Debtors are requesting

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

additional time to file their Schedules of Assets and Liabilities and their Statement of Financing

Affairs ("the Schedules").  The Debtors have a relatively small office staff.  Due to the demands on

the Debtors created by (i) filing these Cases and the reasons giving rise thereto, (ii) the need to

maintain continuity in the Debtors' businesses, (iii) the need to prepare and file several "First Day

Motions," and (iv) the immediate need to comply with the filing requirements as set forth in the

"*Guidelines for Fulfilling the Requirements of the United States Trustee*," I believe that the Debtors

will not be able to complete the Schedules within the fourteen (14) day period set forth in Rule

1007(c) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), as I understand

such Bankruptcy Rule based on information and belief.

97.    Given the circumstances of the Debtors' above-captioned chapter 11 cases (the

"Cases"), I believe that the Debtors need an extension of time in order to carefully, thoroughly, and

accurately prepare their Schedules.  Consequently, the Debtors request that this Court extend the

time within which they must file their Schedules up to and including June 18, 2010.

98.    Because the requested extension of time will allow the Debtors to file more

accurate Schedules and will not prejudice creditors by the extension of time, I believe that cause

has been shown for the requested thirty (30) day extension from the current May 19, 2010 deadline

to June 18, 2010.  I believe that it will take several weeks for the Debtors to analyze and compile

the information needed to complete their Schedules.  Under the circumstances of these cases, I

believe that the Debtors' requested thirty (30) day extension is appropriate and reasonable.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge.

Executed this 6th day of May 2010 in Monterey, California.

*/s/ James M. Flagg*
James M. Flagg

Pachulski Stang Ziehl & Jones LLP
Attorneys At Law
Los Angeles, California